OPINION OF THE COURT
Andrew S. Fusco, J.
*404 THE FACTS
On or about May 19, 1989 the plaintiff entered into contract No. 0004000248 with the defendant to lease-purchase a new 10-piece sectional seating group commonly known as a "conversation pit.” Pursuant to this first contract, plaintiff was to pay defendant a weekly rent of $22.99 (plus tax, late fees, and damage waiver fee). Under the first contract’s provisions if the plaintiff made his weekly payments for a set amount of weeks in a row, he owned the sectional seating set.
According to the receipts supplied to the court by the plaintiff, the plaintiff made the following payments on contract No. 0004000248:
[[Image here]]
It appears from the written documents before the court, that on June 21, 1989, the plaintiff decided to rent from defendant two used end tables and matching new coffee table to go along with the sectional group he had rented the month previous. Therefore, the parties on June 21, 1990 entered into a second contract, No. 0004000579, which encompassed the 10-piece sectional group, the end tables, and the coffee table into one agreement, replacing the May 19, 1989 contract.
Pursuant to the terms of the second agreement, the plaintiff was to pay $25.99 weekly in rent for all of the furniture (plus tax and late charges). Under terms of this second agreement if the plaintiff made 87 consecutive weekly payments, he would have paid a total of $2,261.13 in rent and would have been the owner of the furniture group.
According to a business record supplied to the court by the defendant, the plaintiff made the following payments on contract No. 0004000579:
Payment Date Amount 1 6/21/89 $27.81 2 6/29/89 $30.00 3 7/12/89 $61.61 4 7/19/89 $28.40 5 7/27/89 $28.40 6 8/2/89 $29.85 7 8/16/89 $61.76 8 8/23/89 $29.20
*405 [[Image here]]
The sporadic nature of plaintiffs payments and their varying amounts are self-evident from the above two schedules. It appears that sometimes the plaintiff doubled up (and once tripled) his payments; that sometimes he apparently rounded off the amount due; and that the exact amount owed varied from almost week to week because of accrued late charges.
Although the payment amounts vary from payment to payment, the court is able to discern that the plaintiff did pay the defendant 4 rental payments of $22.99 on contract No.0004000248 and 50 rental payments of $25.99 on contract No. 0004000579. Thus, the plaintiff paid total payments of $1,391.46 to the defendant. (The rest of the money paid by plaintiff to defendant is attributed to sales taxes, liability waiver fees, late charges, and processing charges.) Thus, the court computes that the plaintiffs rental-purchase payments *406 of $1,391.46 represented 61.5% of the aforesaid $2,261.13 total needed to own the furniture.
On or about May 18, 1990, the plaintiff voluntarily surrendered the furniture group to the defendant because he was moving to a new apartment. The plaintiff claims to have told the defendant’s representative that the surrender was temporary (plaintiff calls the surrender "storage” in his testimony) and he allegedly told the defendant that he intended to reinstate the contract once he was settled into his new apartment. Both the text of the contracts at bar and the Personal Property Law of the State of New York give lease-purchasers certain "reinstatement” rights which are discussed further herein.
Defendant’s store manager testified that the defendant did not believe that the plaintiff would reinstate the contract because of his previous sporadic payment practices. Hence, soon after the May 18 surrender, the defendant leased the furniture to a third party.
On or about July 10, 1990 the plaintiff returned to the defendant’s store to reinstate his contract. It was then that the plaintiff learned the defendant had lease-sold the subject furniture to somebody else. The defendant then offered the plaintiff a different furniture group. Plaintiff declined and commenced this action to recover his payments.
ISSUE OF LIABILITY
The rental-purchase agreement is personal property’s counterpart to the real estate land contract. Both devices often attract buyers who cannot obtain conventional financing. And, with both devices, title usually remains with the seller until all payments are complete.
Because title is not conveyed until the end of the contract, buying pursuant to these types of agreements has historically been fraught with risk. A purchaser could make substantial payments, then default, and end up with nothing.
The law abhors such forfeitures.
Consequently, New York courts have, in recent years, recognized certain equitable rights of purchasers in the land contract situation. (See, for example, Bean v Walker, 95 AD2d 70 [4th Dept 1983].) Along the same lines, to regulate the growing rent-to-own industry, New York’s Legislature in 1986 adopted a new article 11 (§§ 500-507) of the Personal Property Law. Entitled "Rental-Purchase Agreements”, the new law *407 codified certain consumer rights in the rental-purchase agreement situation. One such right is the right of "reinstatement” under Personal Property Law § 501 (5) and (6).
"An important innovation [of Personal Property Law § 501] is the consumer’s right to reinstate a rental purchase agreement within a limited time after skipping payments without loss of rights or options previously acquired,” observed the Syracuse Law Review (Donnelly & Donnelly, Commercial Law, 38 Syracuse L Rev 141, 194) in 1987.
In the case at bar, the court finds that the plaintiff elected to reinstate his statutory rights when he went to defendant’s store on July 10, 1990. The court further finds that this election was timely made, since the plaintiff had paid 61.5% of the rental-purchase price; thus, under the Personal Property Law, had 60 days from May 18, 1990 to statutorily elect reinstatement. "On reinstatement, the merchant shall provide the consumer with the same merchandise or substitute merchandise of comparable quality and condition,” according to Personal Property Law § 501 (6).
The narrow issue presented to this court is as follows:
Was the second furniture set offered by defendant to plaintiff on July 10, 1990 "substitute merchandise of comparable quality and condition”, such that the defendant’s obligation under the statute is satisfied and the plaintiff’s cause of action is defeated?
The defendant insists and the court agrees that the quality of the allegedly substitute furniture proffered to the plaintiff on or about July 10, 1990 was of comparable price and workmanship to the first set; also both sets were new or nearly new and in good shape, and, thus, comparable in condition.
However, according to uncontroverted testimony, the two sets were very different in character. The first was a black/ steel gray 10-piece sectional "conversation pit” with ottomans. The second was a blue couch, love seat, and chair. The first end tables and coffee table were black onyx with gold trim. The substitute end tables and coffee table were wood colored.
There have been no reported cases in New York to guide this court in determining what is and what isn’t suitable "substitute merchandise” under Personal Property Law § 501 (6).
Moreover, the Uniform Commercial Code sheds little light on the subject. Although the UCC speaks of substitute goods *408 in sections 2-501 and 2-508, the Code does not define "substitute;” nor do its commentaries or cases provide guidance in the case at bar. (See, for example, Intermeat, Inc. v American Poultry, 575 F2d 1017 [2d Cir 1978] [where identical products with a different brand name is a substitute]; Bodine Sewer v Eastern Ill. Precast, 143 Ill App 3d 920, 493 NE2d 705 [1986] [where a superior grade of sewer pipe is substitute for a lesser grade].)
The court has reviewed Personal Property Law article ll’s Bill Jacket of legislative memoranda and it provides no insight into what the Legislature precisely intended by use of the phrase "substitute merchandise.”
The court finds that the condition and quality of the two furniture sets at bar was comparable; that is, they were both of similar price, durability, workmanship, age, and both were in fairly new shape. However, I hold that a court should also consider the character of substitute merchandise, in addition to its quality and condition. That the two pieces of merchandise be essentially of the same character or type, seems implicit by use of the word "substitute” in the statute. That is to say, Personal Property Law § 501 requires that we substitute apples for apples, oranges for oranges, etc.
And while they perform very similar functions, this court feels that a 10-piece sectional conversation pit is not "substitute merchandise” for a couch, love seat, and chair.
Consumer protection motivated enactment of Personal Property Law article 11, which Governor Mario Cuomo called "the strongest protections in the country for consumers who enter into rental-purchase agreements”, when signing the bill into law. (1986 McKinney’s Session Laws of NY, at 3198.) To fully protect the consumer’s rights, substitute merchandise ought to be of the same character, as well as the same quality and condition, as the surrendered merchandise. Substitute goods which are different in character aren’t really a substitute at all.
The law must be careful not to hold merchants to too high a standard in transactions like the one at bar. We certainly can’t expect rental-purchase dealers to have two of everything, or to become warehousemen, holding surrendered goods for the statutory time limit in order to cover every eventuality. The consumer should not have an expectation that he’ll get back the same or nearly the same merchandise he surrendered. So long as the substitute merchandise is of the same *409 quality, condition, and character, it satisfies the law, even though it may not satisfy the subjective taste of the consumer. This is a risk the consumer must assume when he surrenders rental-purchase goods.
Courts will inevitably have to decide what is and what isn’t acceptable substitute personalty on a case-by-case basis. Is a non-cable-ready TV a substitute for a similar, but cable-ready, set? Is an armless chair a substitute for one with arms?
These questions are left for other days in other courts. In the case at bar, this court holds that the defendant here had to have at least offered the plaintiff another sectional pit group to have satisfied the statute. In failing to have done so, the defendant is liable.
THE ISSUE OF DAMAGES
The court is confronted here with two methods to compute damages.
One method urged is to determine the sum of the plaintiff’s payments less the value of his use. Under Internal Revenue Service Publication 534 for 1989, the useful life of furniture for depreciation purposes is seven years. The total cost to have purchased the furniture under the contracts at bar would have been $2,261.13. Thus, the straight line value of one year’s use was $323.02.
Under method one, the plaintiff’s "actual damages” (Personal Property Law § 507 [1]) is what he paid for a year’s use —$1,391.46—less the value of that year’s use — $323.02. This method renders a bottom line of $1,068.44.
The second method of computing damages seems implicit in Personal Property Law § 504, which allocates half of each payment made to equity for eventual ownership, and the other half to rent for present use.
Under method two, the plaintiff’s damages are $695.73 (that is, half of what he paid to the defendant), because by denying the plaintiff’s right of reinstatement, the defendant denied him the value of his equity.
While both methods are logically sound, the Legislature appears to have come down on the side of the latter by its enactment of Personal Property Law § 504.
Thus the court finds for the plaintiff in the amount of $695.73 actual damages, plus costs. The court does not find that the defendant acted in bad faith here, and thus the award is limited to actual damages only.